OPINION OF THE COURT
Michael J. Obús, J.
*82 Defendant Cheryl Wilkins (indictment No. 8620-96), along with Lasyah Palmer and Alonzo Hardy (indictment No. 6704-96), stand charged with robbery in the first degree and other related offenses arising out of the gunpoint hijacking of a Federal Express delivery truck driven by Mr. Hardy on May 15, 1996. The People allege that Mr. Hardy was the "inside man” in this robbery and that he and Lasyah Palmer were also responsible for the December 28,1994 theft of over $50,000 worth of property from Hardy’s truck for which they have been separately charged with grand larceny in the second degree (indictment No. 5691-96).
Ms. Wilkins, who was identified at a lineup as the person who drove the Federal Express truck during the 1996 hijacking, moves to suppress evidence of that identification. At a hearing on her motion, the People presented the testimony of Detective Carmen Marsh, whom the court finds to be highly credible. The court further finds that there is no real conflict between the testimony of Detective Marsh as to the lineup and the brief testimony of defendant Wilkins on that subject. On the basis of this testimony the court renders the following findings of fact and conclusions of law.
FINDINGS OF FACT
On May 16, 1996, Detective Marsh was assigned to investigate the hijacking of a Federal Express delivery truck that had taken place the previous day. She interviewed Richard Urdaneta, a retired police officer who was working as the armed security guard on the truck, as well as the driver, Alonzo Hardy. Mr. Urdaneta and Mr. Hardy separately explained to Detective Marsh that they had been held at gunpoint by a male black who entered the passenger door of the vehicle where it was parked at 2 West 46th Street in Manhattan. Another robber put on Hardy’s hat and then drove the truck, with Urdaneta and Hardy still on board, to the vicinity of 128th Street and St. Nicholas Avenue, where a third male black took the key to the rear cargo door. After hearing what sounded like the unloading of the truck, Urdaneta and Hardy were ordered to remain in the vehicle long enough for the robbers to make their escape, which they did before Urdaneta exited and called 911.
As a result of information gathered by Detective Marsh, Cheryl Wilkins was arrested on October 1, 1996, and taken to the Major Case Squad in Brooklyn to be placed in a lineup. In view of her masculine features, Detective Marsh consulted the *83 Legal Bureau of the New York City Police Department as to who should, be used as fillers. Having been advised simply to make the lineup as fair as she could, Detective Marsh and other detectives attempted to find both men and women with similar features to Wilkins. They were unsuccessful in locating any appropriate male fillers and eventually found five black females to participate.
On her arrest report, Cheryl Wilkins, who chose position number three in the lineup, was noted to be 5 feet 6 inches tall and to weigh 200 pounds. On the lineup form, the fillers were listed as follows: number one, 5 feet 7 inches and 200 pounds; number two, 5 feet 3 inches and 125 pounds; number four, 5 ■feet 4 inches and 130 pounds; number five, 5 feet 1 inch and 150 pounds; number six, 5 feet 1 inch and 119 pounds. In order to minimize differences among the participants, all were seated with gowns covering their legs so that any skirts could not be seen. In addition, they all kept their jackets on and wore baseball caps turned backwards. Detective Marsh conceded that Wilkins had a light mustache at the time, but said that it was not visible at a distance. She also said that no mustache had been mentioned by Urdaneta in his original description of the robber who drove the truck.
The court accepts the testimony of Ms. Wilkins that, at some point during the approximately 25 minutes that she and the other participants were in the lineup room, each was directed by a male voice to step up to the window briefly before resuming her seat and covering her legs with the gown. It finds, however, that this did not take place while Richard Urdaneta was actually viewing the lineup. Wilkins had no idea who, if anyone, was looking through the window when the women approached. And as Detective Marsh explained, the point of having the participants seated and partially covered was to preserve the fairness of the lineup. She credibly testified that, because a request for the subjects to approach the window would have defeated that purpose, she would recall if such a procedure had been employed, and she certainly would have made a note of it in her report. Detective Marsh had no such recollection and had made no such note. Under these circumstances, along with the fact that Detective Marsh did note that Urdaneta was only in the viewing room for a total of two minutes, the court finds that the subjects were seated throughout the viewing as depicted in the lineup photographs introduced at the hearing.
This finding is also supported by the detective’s credible testimony as to the sequence of events during that two-minute *84 period. Urdaneta was asked to look at the lineup to see if he recognized anyone from the robbery. His initial reaction was, "What’s this?”, evidently expressing surprise that he was looking at females. He was then simply directed to look at the lineup carefully and let the detective know if he recognized anyone. After looking for about a minute, Urdaneta chose number three, Ms. Wilkins, and when he was asked, "Where from?”, he stated that she was "the driver.” As he was being escorted from the lineup room, Urdaneta continued to laugh and express embarrassment that he had thought the driver was a man.
CONCLUSIONS OP LAW
Defendant Wilkins moves to suppress evidence of her identification by Richard Urdaneta at the lineup conducted on October 1, 1996. She contends that the lineup was unduly suggestive because of the difference in size between her and a number of the fillers and, in a novel argument, because none of the fillers were men.
It is "firmly established” that unduly suggestive pretrial identification procedures are violative of due process and evidence thereof is inadmissible at the trial of an accused. (People v Chipp, 75 NY2d 327, 335, cert denied 498 US 833 [1990].) There is no requirement, however, that "lineup participants be 'nearly identical in appearance’; they need only have a sufficient resemblance to each other to avoid a substantial likelihood that the defendant would be singled out for identification’ ”. (People v Edmonds, 223 AD2d 455 [1st Dept 1996], lv denied 88 NY2d 984 [1996], quoting People v Chipp, 75 NY2d, at 336; see also, People v Cruz, 220 AD2d 253 [1st Dept 1995], lv denied 87 NY2d 920 [1995]; People v Rudolph, 161 AD2d 115 [1st Dept 1990], lv denied 76 NY2d 795 [1990].)
In the matter at bar, due to the masculine features and size of Ms. Wilkins, who is 5 feet 6 inches tall and weighs approximately 200 pounds, Detective Marsh was presented with an unusual problem in securing fillers to place in the lineup. Recognizing the need to be careful, the detective contacted the Legal Bureau of the New York City Police Department for advice and, while she was given little in the way of practical help by that Bureau, did seek to locate both men and women who could fairly be employed. Despite her efforts, Detective Marsh was unable to find any men who would be appropriate fillers, but did secure five women of the same race and approximate age as the defendant.
*85 It is true that, according to the lineup forms introduced at the Wade hearing, the other women in the lineup were generally of smaller stature than Ms. Wilkins. One, however, was actually larger, at 5 feet 7 inches and 200 pounds, and steps were taken to minimize the size and appearance differentials among the participants. All of the women were seated with a drape covering the lower halves of their bodies. They wore jackets. And all were given baseball hats to wear backwards during the procedure. Furthermore, while there was testimony that Ms. Wilkins had a light mustache, any facial hair was not readily apparent from a distance. Thus, as reflected in the lineup photographs offered at the hearing, notwithstanding "statistical” differences between Ms. Wilkins and some of the fillers, those differences were not so apparent as to single out the defendant. (See, People v Edmonds, 223 AD2d, supra, at 455; People v Pinckney, 220 AD2d 539 [2d Dept 1995], lv denied 87 NY2d 906 [1995]; People v Garcia, 215 AD2d 584 [2d Dept 1995], lv denied 86 NY2d 794 [1995].)
On the more subjective issue of Ms. Wilkins’ masculine features, although Mr. Urdaneta initially reported that the robber in the baseball hat who drove the Federal Express truck had been a man, it must be noted that, as reflected in the photographs, Wilkins’ gender at the time of the lineup could readily be discerned. Thus, even if there are men in existence whose features are generally similar to those of Ms. Wilkins, it seems clear that had Detective Marsh placed one or more men in this lineup, in all likelihood more problems would have been created than solved.
Finally, although Ms. Wilkins testified at the hearing that, at some point during the 25 minutes that she was in the lineup room with the fillers, each was directed to step up to the viewing window briefly, the court has found, as set forth above, that all participants were seated during the approximately two minutes that they were actually being observed by Richard Urdaneta. Under these circumstances, there is no substantial constitutional issue which would require Urdaneta’s production and testimony to resolve. (See, People v Chipp, 75 NY2d, supra, at 338.)
In selecting the fillers and conducting the lineup, Detective Marsh compensated for Ms. Wilkins’ somewhat unique features in a reasonable and nonsuggestive manner. As displayed to Mr. Urdaneta, the participants in this lineup were sufficiently similar to Wilkins in appearance to present him with a fair test of his ability to make an identification. Accordingly, defen *86 dant Wilkins’ motion to suppress the identification testimony is denied.